HAMILTON COUNTY MUNICIPAL COURT

HAMILTON COUNTY, OHIO

CRIMINAL DIVISION

| | | |
|---|---|---|
| THE STATE OF OHIO, Plaintiff, | : | |
| Vs. | : | Case No. C/06/CRB/1414 |
| JOHN GRIESINGER, Defendant | : | TRIAL TO THE COURT TESTIMONY ONLY |

TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

BETSY SUNDERMANN,
On behalf of the State.

RICHARD J. GOLDBERG,
On behalf of the Defendant.

BE IT REMEMBERED that upon the hearing of this cause, in the Hamilton County Municipal Court, before the Honorable DAVID C. STOCKDALE, one of the said judges of the said court, on February 14th, 2006, the following proceedings were had.

INDEX OF WITNESSES


| WITNESS: | PAGE: |
|---|---|
| LINDA LANG | |
| Direct Examination | 6 |
| Cross-Examination | 14 |
| TONY LIVENGOOD | |
| Direct Examination | 20 |
| Cross-Examination | 23 |
| ROD HOUSLEY | |
| Direct Examination | 26 |


---

INDEX OF EXHIBITS


| | Identified | Admitted |
|---|---|---|
| FOR THE STATE: | | |
| 1. | 11 | 28 |
| 2. | 11 | 28 |
| 3. | 11 | 28 |
| FOR THE DEFENDANT: | | |
| (None) | | |

MS. SUNDERMANN: John Griesinger.

THE COURT: All witnesses who are going to be testifying in this matter today, please come forward to be sworn.

(Witnesses duly sworn)

MR. GOLDBERG: Move for separation, Your Honor.

THE COURT: All witnesses who are going to be testifying in this matter who are not currently testifying, please go out in the hallway. Remain there until you are called. Don't discuss your testimony or that of any other witness with anyone other than the attorneys.

MR. SUNDERMANN: I told my first witness, Your Honor, she could remain in the courtroom. Could you designate the officer --

THE COURT: Do you have an opening statement?

MS. SUNDERMANN: Waive.

THE COURT: Mr. Goldberg, do you have an opening statement?

MR. GOLDBERG: I'll waive.

THE COURT: You may designate the

officer.

MS. SUNDERMANN: Before we start we need some stipulations. We have three state's exhibits, 1, 2 and 3. We're stipulating that these were photos taken by the defendant and these were photos e-mailed by the defendant to the victim's principal, superintendent, and athletic director. She's an employee of the school.

MR. GOLDBERG: We so stipulate.

MS. SUNDERMANN: We're stipulating --

THE COURT: The principal, the athletic director --

MS. SUNDERMANN: -- and the superintendent of the school system.

MR. GOLDBERG: We'll stipulate that there was -- that he took these photos that came off the video. They weren't stills he took, they came off the video. That's agreeable, isn't it?

MS. SUNDERMANN: It makes a difference. But he sent them to those three people?

MR. GOLDBERG: Yes.

MS. SUNDERMANN: Are we stipulating

to the authenticity and admissibility?

MR. GOLDBERG: I will stipulate to the authenticity. We'll get to the admissibility later.

THE COURT: All right. Anything else?

MS. SUNDERMANN: I need my witnesses back --

MR. GOLDBERG: I'm not sure -- I'll stipulate to the admissibility also.

MS. SUNDERMANN: Okay. Your Honor, just so you know, I think our side has two witnesses. We might call another as rebuttal later, but first I'll call two. First I'll call Linda Lang.

Also, Your Honor, as we discussed in chambers, we would like to move to amend to the statutory language of the (E) Section of the statute exactly. I can do this at the end too, if you would prefer that.

THE COURT: There's no objection from the defendant?

MR. GOLDBERG: No. I'm assuming we're going to try it under the (E) Section.

MS. SUNDERMANN: Okay.

THE COURT: The motion to amend will be granted. You may proceed.

(Whereupon, LINDA LANG was sworn and testified as follows).

DIRECT EXAMINATION

BY: MS. SUNDERMANN

Q. Could you state your name for the record and spell your last name?

A. Linda Lang, L-a-n-g.

Q. How are you employed?

A. Employed as a dance team coach of Loveland High School.

Q. How many dance teams are there?

A. Two.

Q. What are the names of the two teams?

A. The Junior Varsity and the Senior Varsity.

Q. Do you know John Griesinger?

A. Yes.

Q. How do you know him?

A. He's the parent of one of the students on my Junior Varsity team.

Q. Do the Junior Varsity and Senior Varsity teams interact at all?

A. Yes.

Q. Would you describe that?

A. I have members from my varsity teams dancing at every J and D game.

Q. And what -- when the students try out for the team, are they trying out for the Senior Varsity or Junior Varsity team?

A. They were trying out together and they were judged and given a numerical. If you scored high enough you made Senior Varsity, if you scored below the number you made JV.

Q. How long have you been doing that?

A. This is my fifth year as a coach.

Q. Do you see Mr. Griesinger in the room today?

A. Yes.

MS. SUNDERMANN: Would you stipulate --

MR. GOLDBERG: We'll stipulate to identification.

MS. SUNDERMANN: Okay.

Q. Which school is this?

A. Loveland High School.

Q. Is that in Hamilton County, Ohio?

A. Yes.

Q. What's your relationship like with Mr. Griesinger?

MR. GOLDBERG: Objection.

THE COURT: Overruled.

A. Not very good. He doesn't approve of the way I coach or the decisions I make.

Q. Okay. Do you speak with him very often? How's your relationship with him? What's your interaction?

MR. GOLDBERG: Objection.

THE COURT: The objection is sustained unless we can get something specific, germane to this case.

Q. Do you have a good or bad relationship with him?

A. Bad.

MR. GOLDBERG: Objection. Move to strike.

THE COURT: Overruled.

Q. How often do you see him?

A. I see him at every game that the girls dance at, and sometimes at practice.

Q. Do you speak with him?

A. Not usually. Only when I have to.

Q. Why is that?

A. Well, he's made it clear he doesn't like me or think that I'm doing a good job, so I only talk to him when I have to give him information about the teams.

Q. How does he make it clear he doesn't like you?

MR. GOLDBERG: Objection.

THE COURT: Objection sustained.

Q. All right. Could you tell the judge what happened on December 22nd, '05? Where were you? Lay the scene out for him.

A. On the 22nd we had all the girls dance at the basketball game at the high school. It was the Christmas game and I had Santa hats for the girls, and I wore a hat and white jacket and top, and I was there coaching.

And at half-time when the girls dance, I put the music in to start and then I go to the top of the bleachers to watch the girls dance. When it was over we left.

Q. What exactly were you wearing that day?

A. It was exactly what I have on now.

Q. Were you wearing that exact blazer?

A. Yes.

Q. Were you wearing that exact shirt?
A. Not this one, but one just like it.
Q. Was that the way you were wearing it, the way you're wearing it right now?
A. Yes.
Q. You now just referred to the bleachers. Could you tell us, is there one level or two levels? How is it laid out?
A. The bleachers of the high school go up and there's a railing and bleachers above it. I go to the -- as far as the downstairs reach as I can get so I can watch the girls dance.
Q. Did you see the defendant that day?
A. Yes.
Q. What was your interaction with him?
A. Nothing. I just saw that he was there.
Q. Where did you see him?
A. I saw him before I went in when the girls were dancing. I saw him -- I don't know exactly when I saw him, but I saw him before they were dancing.
Q. You didn't speak to him?
A. No.
Q. And his daughter was present?

A. Yes.

Q. After that day, when is the next time you heard anything about this day?

A. About ten days later. May have been closer to two weeks. I'm not sure, because that was the beginning of Christmas break so the school was closed for two weeks.

I got a call one morning at my house from the principal of the school, Dr. Moorehead, asking me to come in and look at some photos she had.

Q. Did you go into her office?

A. I went to the school. I went on to her office and she was in a meeting, so I was directed to go to Rod Housley's office, and he had the pictures to show me.

MS. SUNDERMANN: May I approach, Your Honor?

THE COURT: Yes.

Q. These are State's Exhibits 1, 2, and 3. Ask you just to describe in general, collectively, what are these pictures of?

A. This is me walking up the middle of the bleachers, the stairway of the middle of the bleachers, as I'm going to the top to watch the

girls.

Q. On December 22nd, 2005?

A. Yes.

Q. This the outfit you were wearing that day?

A. Yes.

Q. Are these fair and accurate depictions of what you looked like that day?

A. If you're looking down my top, yes.

Q. Just describe the angle at which these are shot.

MR. GOLDBERG: Objection. They speak for themselves.

THE COURT: Unless she can testify as an expert in photography, the objection is sustained.

Q. What was the name of the person that showed you these?

A. Rod Housley.

Q. The officer?

A. Yes.

Q. What was going through your head when you saw these pictures?

A. I was angry.

Q. Why were you angry?

A. I didn't feel he had any right to take pictures the way he did. And we're not -- he was obviously looking down from above --

MR. GOLDBERG: Objection as to what he was obviously doing.

THE COURT: Sustained.

A. Okay. I was angry. He shouldn't --

Q. Okay.

A. Okay.

Q. What part of your body is shown in those pictures that upset you?

MR. GOLDBERG: Objection. They speak for themselves.

THE COURT: She can describe it. Overruled.

A. My chest area looking down my cleavage.

Q. Was that an area that everyone in the gym could see?

MR. GOLDBERG: Objection.

THE COURT: Sustained.

Q. Was that an area that you meant to be a public area --

MR. GOLDBERG: Objection.

A. No --

THE COURT: Overruled.

Q. Why didn't you mean it to be public?

MR. GOLDBERG: Objection.

THE COURT: Overruled.

A. I didn't wear -- I don't wear clothes for people to look down my shirt at.

Q. From looking at those photos, can you see more or less of your breast area than you can from a straight-on look in a mirror?

MR. GOLDBERG: Objection.

THE COURT: Overruled.

A. More.

MS. SUNDERMANN: Just give me one second, Your Honor.

(Pause in the proceedings)

Q. Do you know of any reason why the defendant would do this?

MR. GOLDBERG: Objection.

MS. SUNDERMANN: Goes to motive.

THE COURT: Sustained.

MS. SUNDERMANN: Okay, that's all I have.

THE COURT: Cross-examination?

CROSS-EXAMINATION

BY: MR. GOLDBERG

Q. Ms. Lang, these events that you have described occurred at Loveland High School?
A. Yes.
Q. Loveland is a public school?
A. Yes.
Q. This happened in the gymnasium at the high school?
A. Yes.
Q. And the public was invited that evening?
A. Yes.
Q. I assume it was the evening, not during the day?
A. Yes.
Q. There were other parents there besides Mr. Griesinger?
A. Yes.
Q. In fact, there were hundreds of people there, over a hundred people, over two hundred people?
A. Probably.
Q. They're all sitting in the bleachers, for the most part?
A. Yes.
Q. The spectators were?

A. Yes.
Q. And Mr. Griesinger, you saw him there?
A. Yes.
Q. He was with his wife?
A. I didn't see her. I remember seeing him.
Q. You did notice him?
A. Yes.
Q. And he had his videocam there?
A. I did not see what -- I just was aware that he was there.
Q. Many parents usually bring their cameras or videocams to these games, don't they?
A. I don't know.
Q. You've never seen parents with cameras there?
A. You asked if "many." I don't know.
Q. Have you seen parents with cameras there?
A. I -- yes. I have actually had it taped before.
Q. You have that taped --
A. I have the dances taped.
Q. The routine?

A. Yes.

Q. So it's not uncommon to have parents bringing cameras there, is it?

A. No.

Q. You saw Mr. Griesinger; he wasn't hiding, was he?

A. No.

Q. And these pictures were shown to you by one of the school personnel, the principal or someone else at the school?

A. Yes.

Q. You knew when you saw the pictures that they were taken on the evening of December 22nd?

A. I was told they were.

Q. You couldn't tell from looking at the pictures when they were taken?

A. Yes, I can tell.

Q. Okay. And you were offended when you saw these pictures?

A. I was angry.

Q. And he took these, this video or pictures of you, without your consent or your permission?

A. Yes.

Q. You were in a public place?
A. Yes.
Q. You didn't expect to have people not looking at you that evening?
A. I did not expect to have people looking at me that way that evening --
Q. But you knew people would be looking at you?
A. Not any more than usual.
Q. Mr. Griesinger had the same view of you as those other people that were in the bleachers that night, didn't he?
A. No.
Q. None of these pictures show anything through your clothing, do they?
A. They show underneath it.
Q. I'm talking about through your clothing?
A. No.
Q. And the pictures accurately depict what you were wearing that evening?
A. From that angle, yes.
Q. And when you walk up the bleachers, I assume they angle upward --
A. Yes.

Q. -- don't they? And the parents are sitting, as bleachers are, they're sitting upwards as it gets into a higher row, correct?

A. When you're walking up the stairway of the bleachers, the parents are sitting on the sides. The only ones above me were standing on the very top of that bleacher.

Q. Do you know where Mr. Griesinger was sitting?

A. No.

Q. You don't know where he was when he took these pictures?

A. No.

Q. You don't know how high he was?

A. I didn't see him taking pictures. I just saw him at some point that night. I knew he was there.

Q. But he wasn't hiding? He was with the rest of the people that were there?

A. Obviously he wasn't hiding if I saw him.

Q. Okay. And obviously the -- I will take that back.

He sent these pictures to other people in the school system?

A. Yes.

Q. With an e-mail?

A. Yes.

MR. GOLDBERG: No other questions.

THE COURT: Redirect?

MS. SUNDERMANN: No questions.

THE COURT: All right, ma'am, you may step down. Please go back to the hallway.

MS. SUNDERMANN: Could you call Tony Livengood from the hallway? Is the alleged victim allowed to stay in the room or not?

MR. GOLDBERG: I would object.

THE COURT: I don't know if that's one of them that the statute covers. I don't think it's one of them that the statute covers.

MS. SUNDERMANN: Thank you, Your Honor.

(Whereupon, TONY LIVENGOOD was sworn and testified as follows)

DIRECT EXAMINATION

BY: MS. SUNDERMANN

Q. Could you state your name for the record and spell your last name?

A. Tony Livengood, L-i-v-e-n-g-o-o-d.

Q. What's your involvement with the Loveland school system?
A. Well, my granddaughter is a sophomore at Loveland.
Q. And Linda who just testified is --
A. She's my granddaughter's dance coach.
Q. Is she Senior Varsity or Junior Varsity?
A. She's on the varsity dance with the seniors.
Q. You have a lot of contact with Linda?
A. Well, through my wife. She talks to my wife a lot.
Q. Were you at the game on December 22nd, 2005?
A. Yes.
Q. Did you see the defendant there?
A. Yes.
Q. Did you talk to him?
A. No.
Q. Could you describe why you saw him, what he was doing?
A. He was sitting about middleways of the bleachers beside the scores until the dance team came and Linda came. Then he got up. A few

minutes after that he went up on the second level and was taking pictures of the dance team and of Linda. I mean --

Q. When you say the second level, do you mean on the same level of bleachers as Linda?

A. Same section of bleachers, but there's a railing that separates the bottom from the top. Normally the students are on the second level, normally.

Q. So what would be the angle if he was taking a picture of Linda? Was he directly over her or at an angle?

A. It was pretty much directly over top.

Q. If you can -- if you can't, I understand -- would you estimate, was he five feet, 50 feet from her?

A. Maybe eight, ten feet from her.

Q. Directly above her, taking a picture?

A. Uh-huh.

MR. GOLDBERG: Objection to the leading on direct, Your Honor.

THE COURT: Overruled.

Q. At any time did you see the camera pointing directly at her?

A. It was, you know, I know he was

taking a picture of the squad, you know, and I know from where Linda was standing at and the way his camera was, he was in that direction. I can't say whether he was taking a picture of her or not, but he was in that direction.

Q. Were you able to see who else was in the second level, if anyone at all, on the level where he was standing?

A. Just students, and that's all I could see, was students.

Q. Did you see other parents up there?

A. No.

Q. How are you familiar with the defendant?

A. Just by other than going to the basketball games and what's happening with the kids' dance is all.

MS. SUNDERMANN: That's all my questions.

THE COURT: Cross-examination?

CROSS-EXAMINATION

BY: MR. GOLDBERG

Q. Sir, would it be fair to say there were about two hundred people in the gym that night?

A. Yes. I would say probably a good guess.

Q. You saw Mr. Griesinger take pictures, didn't you?

A. Yes.

Q. You couldn't tell what was in the viewfinder of the camera, could you?

A. No.

Q. You don't know what he was taking pictures of? You just saw the direction that the camera was pointing?

A. That's true.

Q. What kind of camera did he have?

A. Oh, I -- I couldn't tell you what kind of camera.

Q. Was it a video camera or --

A. No.

Q. -- .35 millimeter?

A. .35 millimeter. It wasn't no movie camera.

Q. Do you know what a digital camera looks like?

A. Uh-huh.

Q. A videocam?

A. Right.

Q. It wasn't one of those?
A. I couldn't tell if it was a video camera or not.
Q. Could you see Ms. Lang walking up the steps of the bleachers?
A. You say did I see her walking up the steps of the bleachers?
Q. Yes. At half-time?
A. Yes, she stopped and talked to my wife and whoever was talking with -- sitting with my wife.
Q. She's friends with your wife?
A. Yes, from my granddaughter being on the dance team.
Q. And other people had cameras there that night?
A. I'm sure.
Q. Not uncommon, is it?
A. I wouldn't think so.
Q. People are taking pictures, they're taking video?
A. Well, I didn't observe anybody doing that, but I'm not saying that they didn't.
Q. Was this man hiding at all?
A. No.

Q. Was he trying to conceal where he was taking these pictures from?
A. No.
Q. He was right out in the open?
A. Yes. He was up on the second level of the bleachers.
Q. Right out in the open?
A. Right there, yes.
MR. GOLDBERG: No further questions.
MS. SUNDERMANN: No more questions.
THE COURT: All right, you may step down. Please go back to the hall.
MS. SUNDERMANN: Don't talk about your testimony out there. I'll call Officer Housley.
(Whereupon, ROD HOUSLEY was sworn and testified as follows)

DIRECT EXAMINATION

BY: MS. SUNDERMANN

Q. Could you state your name, spell your last name for the record, and state your assignment?
A. It's Officer Rod Housley, H-o-u-s-l-e-y. I'm a Hamilton County deputy sheriff assigned to the Loveland High School. I'm

the school resource officer.

Q. Were you so assigned on 12-22-5?

A. Yes, I was.

Q. How did you first get involved in the case we're here for today?

A. I've gotten several phone calls from parents and students that were concerned about --

MR. GOLDBERG: Objection.

THE COURT: Sustained.

Q. How did you get involved with this voyeurism case?

A. The athletic director, Mike Rapp, contacted me and Dr. Moorehead, who's the principal, about the pictures involved with the office.

Q. Did you speak with the defendant?

A. Yes, I did.

Q. When was your conversation with him?

A. The conversation happened after he was arrested. Linda Lang came into the office and was shown the pictures. I took the pictures up to my supervisor, my lieutenant. I didn't know what I had at that time. We called the Prosecutor's office. They said this is --

MR. GOLDBERG: Objection.

Q. I just want to know, what was your conversation with the defendant?

A. With the defendant? After that he was under arrest. We signed a warrant for arrest for the charge he was charged with. The next time I saw him he was under arrest.

Q. What was your conversation with him?

A. I had a brief conversation about what he did. He said he did nothing wrong, he was in plain view and he was in public when he took the pictures.

Q. Did he make any statements about how he felt about Linda Lang?

MR. GOLDBERG: Objection --

A. No, he didn't --

THE COURT: Overruled.

MS. SUNDERMANN: No more questions.

THE COURT: Cross-examination?

MR. GOLDBERG: No questions.

THE COURT: You may step down.

MS. SUNDERMANN: The state rests. We'll move 1, 2 and 3 into evidence.

MR. GOLDBERG: No objection.

THE COURT: State's Exhibits 1, 2, and 3 will be admitted.

MR. GOLDBERG: I'd like to move for a judgment of acquittal, Your Honor. I'll try to be brief.

THE COURT: May I see the exhibits, please?

(Documents tendered to the Court)

MR. GOLDBERG: Your Honor, there are perhaps four elements to this offense. The state has not proven at least two of these four elements that I see.

First or foremost, they must prove that he acted secretly or surreptitiously. Do we know what secretly or surrep- titiously mean? If you need further guidance there's a definition in OJI: "No person shall secretly or surreptitiously videotape, film, photograph, or otherwise record another person under or through the clothing being worn by that other person for the purpose of viewing the body of, or the undergarments worn by, that other person."

They've proven that he was present, he was in the open, he wasn't hiding behind her; he was there with two hundred

other people in a public place, in a public gymnasium at a public event. So there's no evidence at all that what he did was secret or surreptitious. None whatsoever. He was out in the open, he wasn't hiding, he wasn't trying to conceal himself. I haven't heard one iota of evidence that he acted secretly or surreptitiously.

Another element, the videotape. Assume for the same of argument he did have a videotape and he sent that with an e-mail to the school. That's been proven, obviously.

"Under or through that person's clothing." Obviously nothing is through her clothing. You have the evidence, the exhibits. Nothing is under -- nothing is under her or through her shirt. What he photographed was only what was visible to anybody in the gymnasium that night that happened to be near enough to her or that was in camera-shot or eyeshot of her. He had no different view than everybody who was where he was, out in the open, so he

wasn't secretly, also he wasn't hiding. He took pictures in a public place of a person that was fully dressed and fully clothed. This is not voyeurism by any stretch of the evidence here.

Assuming that -- as to those two elements only, because those are the ones that are glaringly not proven, there's been no evidence at all. He had the same view. She was out in the open, that wasn't through clothing or underclothes. This wasn't with a sneaky device, like a cell phone that has cameras now, like mirrors on his shoes, infrared devices or any kind of mechanical device other than a camera. There's no technology here. There's no devious devices.

I've seen these things on TV, camera phones and mirrors and while those people that are immoral or perverts are doing these things, there's no evidence here whatsoever. This is a picture taken of person, a public person in a public place, and no more. That's what the evidence shows. I think he's entitled to an

acquittal at this time.

THE COURT: Ms. Sundermann?

MS. SUNDERMANN: I'll direct you to the two elements also, Your Honor. As far as being sly or with stealth, when he went up there and took pictures of dance people he was out in the open, not being sly or operating with stealth when he was doing that.

When he took the zoom lens and aimed it down onto a woman's breasts, you can see from the pictures that he was a whole level above her. These are zoomed-in pictures. When you take a camera, face it to a woman's breasts and zoom in, that is sly and that is with stealth. She did not -- she's not looking at the camera, she had no idea her picture was being taken. He was hiding that he was doing that.

Your Honor, as far as being under clothes, this goes to the same argument I just made. When you look down into some-one's shirt, you're seeing what's under there, what's under their clothing. The same as if you look up a sleeve or up a

skirt --

THE COURT: Which, if any, of these pictures indicate that that's what was being done?

MS. SUNDERMANN: Your Honor, you can see what I can see from the front of the victim, and these clearly show that you're seeing a crack in her cleavage. That's something you can't see looking straight on to her. This is something only visible --

THE COURT: Is this not a picture straight on?

MS. SUNDERMANN: Look at these pictures --

THE COURT: This is Exhibit 2. Is Exhibit 2 not a picture straight on?

MS. SUNDERMANN: These are not straight-on pictures.

THE COURT: Looks like a straight-on picture to me.

MS. SUNDERMANN: Okay. Please consider the zoom lens also, Your Honor. That's all.

THE COURT: Anything else, Mr. Goldberg?

MR. GOLDBERG: No, Your Honor.

THE COURT: The Rule 29 motion will be granted. Defendant is acquitted.

MR. GOLDBERG: Thank you.

THE COURT: Return the exhibits. Court's adjourned.

(Off the record)

CERTIFICATE

I, Dana F. Ray, an Official Court Reporter for the Hamilton County, Ohio, Municipal Court, duly appointed by the Court to report the within proceedings, do hereby certify that the foregoing thirty-four (34) pages constitute a correct and complete transcript of proceedings.

IN WITNESS WHEREOF I have hereunto set my hand at Cincinnati, Ohio, this 8th day of December, 2006.

Dana F. Ray
Official Court Reporter
Municipal Court
Hamilton County, Ohio